Jack VANDENBERG and Virginia Vandenberg, his wife, Plaintiffs,

v.

H. Benjamin LOSETH, Diane J. Loseth, Thomas Miller, Lou Anne Miller, The Petrolane Gas Partnership a/k/a Petrolane Gas Services and Ziehm LP Gas Sales and Service, Inc., Defendants.

No. 1:92–CV–862.

United States District Court, W.D. Michigan, Southern Division.

July 13, 1994.

Raymond S. Kent, Buchanan & Bos, Grand Rapids, MI, Robert K. Hick, Roper, Myers, Knoll, Bauer & Forman, P.C., Holland, MI, for plaintiffs.

Robert J. Scarfone, Thomas J. Killeen, Joseph T. Longo, Scarfone & Geen, Grosse Pointe, MI, for H. Benjamin Loseth, Diane J. Loseth.

Jonathan S. Damon, Dilley, Dewey, Damon & Condon, PC, Grand Rapids, MI, for Thomas Miller, Lou Anne Miller.

Donald C. Exelby, Cholette, Perkins & Buchanan, Grand Rapids, MI, David R. Schlee, Smith, Gill, Fisher & Butts, Kansas City, MO, for Petrolane Gas Partnership.

William M. Bremer, Bremer, Wade, Nelson, Lohr & Corey, Grand Rapids, MI, for Ziehm LP Gas Sales and Service, Inc.

Robert J. Scarfone, Scarfone & Geen, Grosse Pointe, MI, for H. Benjamin Loseth, Diane J. Loseth.

### *OPINION*

QUIST, District Judge.

Plaintiff Jack VanDenBerg was severely burned when propane gas exploded in a well-pit he entered while helping to open a summer cottage in April 1991. This diversity action for personal injury damages includes claims against the owners of the cottage in which the accident occurred, H. Benjamin and Diane Loseth (the Loseth defendants); the owners of the neighboring cottage whose gas line was the source of the leak, Thomas and Lou Anne Miller (the Millers); Ziehm LP Gas Sales and Service, Inc. (Ziehm), the company that installed the Miller's propane tank and routed the gas lines to the two cottages; and Petrolane Gas Services (Petrolane), the company that provided propane gas services to the Miller's at the time the leak occurred. The Loseth defendants and the Millers have moved for summary judgment on all the claims against them. Plaintiff opposes summary judgment. The issues have been fully briefed. There is no dispute that Michigan law applies.

### *Background Information*

The well pit where plaintiff VanDenBerg was burned on April 25, 1991, was located in a summer cottage that is, and at all pertinent times was, owned by the Loseth defendants and occupied by Mr. Loseth's parents. The Miller cottage, which is next door to the Loseth cottage on Ford Lake in Fountain, Michigan, was previously owned by H. Benjamin Loseth's brother and sold to the Millers in 1980. At the time of the sale, the propane service for the two cottages was provided by a single 500–gallon tank located on the Miller property. The propane gas line crossed to the Loseth property and, within inches of the Loseth cottage, branched by means of a tee fitting. One branch ran to the Loseth cottage and the other traveled a considerably longer distance to the Miller cottage. Shortly after the Millers bought the cottage, defendant Ziehm reconfigured the propane supply system to the cottages and installed a separate 60 gallon tank for the Millers. Rather than sending a new line straight to the Miller cottage, Ziehm attached the old line to the Millers' new tank. It disconnected the pipe that ran to the Loseth's cottage at the tee and closed the opening in the tee with a tee cap. Ziehm then installed a new pipe from the Loseth's tank and tied it into the existing supply line to the Loseth house.

Plaintiff contends that the Millers' use of their cottage was fairly consistent from 1982 through 1993 and that, during those years, they used the same propane-fueled appliances—a hot water heater, a furnace, and a stove. Plaintiff alleges, with support from Mr. Millers' deposition, that the Millers' consumption of propane remained relatively constant from 1982 to 1987, at an average of approximately 120 gallons per year, that it rose in 1988 to 170 gallons and in 1989 to 200 gallon. Petrolane took over servicing the Millers' gas system in 1989 and replaced the 60–gallon tank with a 120–gallon tank. In 1990, the Millers ran out of gas on two occasions and consumption remained high. Mr. Miller testified that gas consumption in 1990 was between 175 and 230 gallons. After the second time the Millers ran out of

gas, Petrolane's records show that it left a notice advising the Millers to have Petrolane check out the system before they turned on the gas. There is no indication that the Millers had the system checked. Petrolane replaced the 120 gallon tank with another 120 gallon tank in December 1990. Between April 7 and April 26, 1991, while the Millers were not at their cottage and had only the pilot lights operating on the furnace and stove, their propane tank went from 80% to 32% full, leaking approximately 55 gallons according to plaintiff. The fire occurred on April 25, 1991.

The gas that leaked from the Millers' line escaped through the cap in the tee, traveled through the earth, and concentrated in the well pit in the Loseth's cottage. In traveling through the earth, the gas was scrubbed of its warning odor. When plaintiff entered the well pit, he paused to light a cigarette. As soon as he struck his lighter, the gas exploded. A ball of fire rose above the well pit, catching plaintiff's clothes on fire and preventing his escape. He was severely burned and suffers ongoing pain, disfigurement, and physical limitations as a result of the burns. His damages also include loss of income.[1]

### Issues Presented

There is no dispute that Mr. VanDenBerg incurred severe injuries as a result of the fire. Neither is there any dispute that the fire was caused by the explosion of gas from a leak in the tee cap on the gas supply line to the Millers' cottage. The central issue in dispute is: who is liable for the injuries to VanDenBerg?

Plaintiff's claim against the Loseth defendants is a negligence claim for failure to maintain the premises in a reasonably safe condition or to inspect, discover, or warn others of the dangerous condition. The Loseth defendants have moved for summary judgment on the grounds that they cannot be liable under the law of Michigan because they had neither possession nor control of the premises in question. They also argue for summary judgment on the grounds that

neither they nor their parents knew or should have known of the gas leak and that no action or inaction by the Loseths was the proximate cause of plaintiff's injury.

Plaintiff's claim against the Millers is also a negligence claim, based on a duty to exercise due care regarding their propane storage and distribution system. Millers argue that they are not liable under any theory of premises liability because neither the gas leak nor plaintiff was on their property and because plaintiff was not their invitee.

### Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the nonmoving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. The summary judgment standard mirrors the standard for a directed verdict. The only difference between the two is procedural. Summary judgment is made based on documentary evidence before trial, and directed verdict is made based on evidence submitted at trial. 477 U.S. at 250–51, 106 S.Ct. at 2511.

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265

---

1. Jack VanDenBerg's wife, Virginia, is also a plaintiff and seeks damages for loss of society, wages, companionship, and consortium of her husband and her wages due to his need for her care.

(1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi,* 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but the court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## DISCUSSION

### Loseth Summary Judgment Motion

#### Landlord Control

■ The Loseth defendants claim that they are not liable because, at the time in question, the property was leased to Mr. Loseth's parents, Joseph and Hildred Loseth, and neither Mr. Loseth nor his wife had any control over repairs or maintenance to the property. This issue was originally presented to the Court in a motion to dismiss. The Court denied the motion to dismiss without prejudice and with leave to refile at the close of discovery.

Defendants purchased the property from Mr. Loseth's parents on March 22, 1971, and immediately leased it to them for a term ending upon the death of both lessees. Joseph Loseth died some time after the accident at issue in this lawsuit occurred. Mr. Loseth, Diane Loseth, and Hildred Loseth have each executed affidavits in which they aver that all the repairs and maintenance on the property during the relevant time was done by Mr. Loseth's parents and that defendants have never had conversations with the parents regarding "the necessity or appropriateness of any improvements or maintenance of the property." The affidavits also state that the parents never asked permission before making improvements or performing maintenance and that they controlled all aspects of construction, maintenance, and improvements on the property.

In response, plaintiff has alleged that the defendants are responsible under the law for maintaining the property and that the elder Loseths acted as their agents. H. Benjamin Loseth said in deposition that he considered his father perhaps more capable than himself to maintain the property. Defendants have admitted that they were informed by Mr. Loseth's parents of work that was done on the property. They also admit that they insured the property and reimbursed the parents for maintenance and repairs and deducted on their tax return depreciation and expenses for maintenance of the property.

Defendants base their argument on the rule set forth in *Merritt v. Nickelson* that "[p]remises liability is conditioned upon the presence of both possession and control over the land." 407 Mich. 544, 552, 287 N.W.2d 178, 180 (1980). In *Merritt,* the property in question was owned by a mother and son as tenants in common. The son developed the property for drag racing and, on the first day it was opened to the public, a spectator was killed by a fragment of steel thrown from one of the race cars. Following a verdict against both the mother and son, the mother appealed on the grounds that she was not jointly liable for the accident. The court held that the son was solely liable because he alone was in possession and control of the property. "His occupancy of the land was under his own right, not hers. He was not her agent by the mere fact of their joint ownership nor were the acts performed by him transformed into a joint venture." *Id.* at 553, 287 N.W.2d at 181. The instant case, however, involves a landlord and tenant, not joint ownership.

Defendants also cite *Lipsitz v. Schechter,* which described the common-law duty of a landlord as follows:

The common-law duty is predicated upon the concept that a lease is equivalent to a sale. The lessor, absent agreement to the contrary, surrenders possession and holds only a reversionary interest. Under such circumstances, he is under no obligation to look after or keep in repair premises over which he has no control.

377 Mich. 685, 687, 142 N.W.2d 1, 2 (1966).

The duty of lessors of residential property has changed, however, since *Lipsitz* was de-

cided. Since 1968, the following has been required of lessors under M.C.L.A. § 554.-139:

> Sec. 39. (1) In every lease or license of residential premises, the lessor or licensor covenants:
>
> (a) That the premises and all common areas are fit for the use intended by the parties.
>
> (b) To keep the premises in reasonable repair during the term of the lease or license, and to comply with the applicable health and safety laws of the state and of the local unit of government where the premises are located, except when the disrepair or violation of the applicable health or safety laws has been caused by the tenants wilful or irresponsible conduct or lack of conduct.
>
> (2) The parties to the lease or license may modify the obligations imposed by this section where the lease or license has a current term of at least 1 year.
>
> (3) The provisions of this section shall be liberally construed, and the privilege of a prospective lessee or licensee to inspect the premises before concluding a lease or license shall not defeat his right to have the benefit of the covenants established herein.

The lease defendants attached to their affidavits does not contain any language that modifies the obligations imposed by this statute. The statements in the affidavits recount that it was Mr. Loseth's parents' practice to take care of improvements and maintenance. These averments do not, however, establish that defendants' obligations under that statute were nullified. In fact, defendants' practice of paying for the maintenance and improvements supports plaintiff's contention that the repairs were done on behalf of lessors in fulfillment of their statutory obligations.

In *Mobil Oil Corp. v. Thorn,* 401 Mich. 306, 258 N.W.2d 30 (1977), the Michigan Supreme Court considered whether an obligation to do repairs could result in liability for an injury if the lessor breached the obligation. The court held that the common-law rule that a landlord was not liable for injuries arising from a breach of a covenant to do repairs "has been abrogated in its applicability to leases for residential dwellings with the enactment of 1968 P.A. 286, § 136, M.C.L.A. § 125.536; M.S.A. § 5.2891(16)." [2] *Id.* at 310, 258 N.W.2d at 32. The court proceeded to abrogate the rule for commercial leases as well and to adopt, as a general principle, the rule stated in 2 Restatement Torts, 2d, § 357:

> "A lessor of land is subject to liability for physical harm caused to his lessee and others upon the land with the consent of the lessee or his sublessee by a condition of disrepair existing before or arising after the lessee has taken possession if
>
> "(a) the lessor, as such, has contracted by a covenant in the lease or otherwise to keep the land in repair, and
>
> "(b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented, and
>
> "(c) the lessor fails to exercise reasonable care to perform his contract."

401 Mich. at 311–12, 258 N.W.2d at 33. In this instance, defendants are obligated by law to keep the property in repair. Thus, the potential liability described in *Thorn* is applicable.

The cases defendants cite and the arguments they present in their motion and reply briefs do not require a different conclusion. In *Williams v. City of Detroit,* 127 Mich.App. 464, 339 N.W.2d 215 (1983), defendants prevailed on summary judgment against a plaintiff who had sustained injuries in a leased area of defendant's building, Cobo Hall. *Williams* differs from the instant case in that it involved a commercial lease which expressly provided that the tenant would have exclusive possession and control of an area and full responsibility for security in that area. 127 Mich.App. at 470–71, 339 N.W.2d at 218. In contrast, the Loseths' lease carries with it

---

**2.** This statute, which sets forth standards for rental units, does not apply to the Loseth property because units outside of cities are not included unless the local governmental unit votes to make the statute applicable. M.C.L.A. § 125.401. Yet the action of the *Thorn* court makes it clear that this duty is not limited to urban landlords of residential property.

a legal obligation under M.C.L.A. § 554.139 to "keep the premises in reasonable repair during the term of the lease" and contains no language giving Mr. Loseth's parents exclusive responsibility for maintaining the property.

*Johnson v. Davis,* 156 Mich.App. 550, 402 N.W.2d 486 (1986), concerned the liability of the vendor of a building to the lessee of the purchaser. The court stated, "Nor were [defendants] lessors of the property to plaintiffs or under the contractual duty to maintain the premises in a reasonably safe condition. Any duty to maintain the premises in a reasonably safe condition was upon the lessor." *Id.* at 554, 402 N.W.2d at 488. The discussion of "control" pertains to vendors and has no relevance to the instant case.

*Little v. Howard Johnson Co.,* 183 Mich. App. 675, 455 N.W.2d 390 (1990), also involved a commercial property owner. Plaintiff slipped on a sidewalk at a restaurant operated by a franchisee of Howard Johnson Company and sued Howard Johnson. The franchise agreement specifically provided that the franchisee was to "maintain the interior and exterior of the buildings and surrounding premises in a clean, orderly, and sanitary condition." *Id.* at 679, 455 N.W.2d at 393. The court held that, while Howard Johnson maintained some degree of control over the property under the franchise agreement, it did not have the right to control the franchisee's day-to-day operations and thus could not be held liable for the condition of the sidewalks. *Id.* at 682, 455 N.W.2d at 394. In contrast, in the instant case, the duty of keeping the premises in reasonable repair is vested by law in the lessor. Moreover, the issue in this case does not concern a day-to-day maintenance duty like an obstruction in a walkway but, instead, the maintenance of a major system. It is not necessary to find that the Loseth defendants were in control of the day-to-day operations of life at the cottage but only that they had not been divested of their responsibility for maintaining the propane system and that in any action Mr. Loseth's parents took with respect to the propane system they acted as his agent. The evidence the parties have marshalled shows that there are genuine issues of mate-

rial fact for trial on the issue of whether Mr. Loseth's parents were defendants' agents or whether they had taken over and removed from defendants the legal obligation imposed on lessors by law.

## Loseths' Notice of Defect

The Loseth defendants' second argument for summary judgment is that none of the Loseths had notice or should have known of the defect that caused Mr. VanDenBerg's injuries. Plaintiff asserts that three separate defects contributed to his injury—the cracked tee cap, the configuration of the gas supply system which routed the Millers' supply line within inches of the Loseth foundation, and numerous leaks in the Loseth's cottage that plaintiff contends contributed propane to the concentration in the well pit that exploded.

The Michigan Supreme Court has adopted the definition of a premises owner's duty to invitees in the Restatement (Second) of Torts, § 343, which provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

*Riddle v. McLouth Steel Products Corp.,* 440 Mich. 85, 93, 485 N.W.2d 676, 680 (1992).

Defendants also cite *Kroll v. Katz,* 374 Mich. 364, 373, 132 N.W.2d 27, 32 (1966), which held that owners had no premises liability for harm from conditions from which no unreasonable risk was to be anticipated. With respect to the tee cap, the Loseth defendants maintain that they are not liable under the Restatement definition because the condition of the tee cap was not one that any of the Loseths knew about or would have discovered by the exercise of reasonable care.

■ Plaintiff does not really dispute that Loseths did not know about the cracked tee cap, but he maintains that the senior Mr. Loseth had actual knowledge of the configuration of the gas supply line and that the configuration in itself created a danger for which the Loseths should be liable. At most, however, the configuration created a potential for danger. It is difficult to conclude that the Loseth defendants have any liability for the allegedly defective design of the propane supply system. There is no evidence that any of the Loseths had any role in the design or did more than acquiesce in the configuration Ziehm put in place. Moreover, plaintiff does not suggest reasonable steps the Loseths should have taken. Instead, he argues that the Loseth's deprived themselves of the ability to take reasonable precautions over a propane system on their property by permitting a system for which they would not receive notice of excess consumption.

As to the propane leaks at various appliances in the Loseth cottage, plaintiff cites deposition testimony regarding small leaks found at several points on the Loseth property after the fire occurred. The Loseth defendants object that there is no evidence that any propane leaked from the appliances, which had been off for the winter. They also argue that, since none of the leaks was significant enough to be detected by smell, but could only be found using a soap-bubble test, the Loseths were not in the position in which they should have known about the leaks or should have made an investigation. Michigan Standard Jury Instruction 19–03 states: "a possessor has a duty to inspect premises to discover possible dangerous conditions of which the possessor does not know *if a reasonable person would have inspected under the circumstances.*" SJI2d 19–03 (emphasis added).

■ Although there may be a question of fact as to whether there were leaks that contributed to the explosion, the real issue regarding the alleged leaks on the Loseth property is whether the Loseths breached a duty to plaintiff by failing to discover these leaks. In the absence of any tell-tale odor of gas or a warning from the gas company that the system should be inspected, it cannot be said that the Loseths had a duty to inspect prior to the accident on April 25, 1991. Thus, as to each of the defects plaintiff claims as the basis of the Loseths' liability, none makes them liable for Mr. VanDenBerg's injury. Accordingly, the Loseth defendants' motion for summary judgment will be granted.

### *Miller Summary Judgment Motion*

#### *Introduction*

In their motion for summary judgment, the Millers argue that they are not liable because they had no duty to plaintiff, who was not on their land when the accident occurred. They also argue that they had no knowledge of either the configuration of the gas supply line or the leak and owed no duty of inspection to VanDenBerg because he was not their invitee and was, at best, a licensee to whom no duty of inspection was owed. Plaintiff asserts that the Millers' liability arises not out of his status on the land but because of Millers' duty to exercise care with respect to propane gas as a dangerous commodity. He also argues that, even under Millers' analysis of the duty owed a licensee, they are liable because they had "reason to know" that there was a gas leak.

#### *Duty of Care*

Plaintiff asserts that the Millers' duty of care arises from the rule stated in *Gadde v. Michigan Consolidated Gas Co.*, 377 Mich. 117, 126, 139 N.W.2d 722, 726 (1966):

[G]as has long been regarded as a dangerous substance. Anyone dealing with this commodity, because of its dangerous propensities, must exercise such care for the safety of others as a reasonably prudent man would exercise in the face of such potential danger.

*Id.* at 126, 139 N.W.2d at 726 (citing *Young v. Lee*, 310 Mich. 42, 16 N.W.2d 659 (1944)). *See also Walker v. Consumers Power Co.*, 136 Mich.App. 265, 355 N.W.2d 907 (1984), in which the court upheld jury instructions that did not state that there was a higher standard of care with regard to gas but, rather, required the exercise of due care and stated: "It is the duty of the Defendant in connection

with this occurrence to use that degree of care that a reasonably prudent person would have exercised in light of the explosive nature of gas." *Id.* at 268–69, 355 N.W.2d at 909. This instruction is consistent with the rule stated in *Gadde.* Plaintiff argues that the required degree of care is especially high with propane gas which is more dangerous than natural gas in that it will not rise and dissipate but instead will fall to the floor and concentrate in low spots.

Plaintiff asserts that Mr. Miller had special knowledge of the dangers of propane gas through his employment. Plaintiff states:

> Mr. Miller gained experience concerning the characteristics and dangers of propane on the job. While working at Rapistan, Mr. Miller was involved in the design of an assembly line for recreational vehicles. Special precautions had to be taken because the RVs used propane gas. In particular, the electric motor which powered the assembly line was located below floor level and had to be explosion proofed. If propane had leaked from one of the RVs on the line, it could have settled near the electric motor creating an explosion danger. (T. Miller Tr. 188–191). In addition, Mr. Miller himself was burned in a propane fire when attempting to light his furnace in 1986. (T. Miller Tr. 186–188).

Brief in Opposition to Motion for Summary Judgment of Defendants Thomas Miller and Lou Anne Miller at 5 n. 1.

At oral argument, the Millers' attorney argued that the duty, as described in *Gadde,* should not apply to the Millers because it had only been applied in cases involving commercial gas companies and had not been applied to individuals. The argument hinged on the phrase "dealing in" gas, which suggests a commercial enterprise. The *Gadde* court, however, does not use that phrase but, instead, uses "dealing with." Due possibility is that the Michigan Supreme Court made a grammatical error. A definition of "deal" in *Webster's Third New International Dictionary* (1971) defines "deal": "to do a retailing or distributing business: ... used with *in* before a thing ... and *with* before a person." A more likely possibility is that the Michigan Supreme Court used the term "deal with" in the sense of "to take action in regard to" propane gas. In effect, this latter definition would mean that *Gadde* applies to those who "handle" or otherwise take some act regarding propane gas. A consumer of propane gas may be "dealing with" the gas in the sense that the gas is being utilized by the consumer. In any event, for the reasons stated below, at this time I do not decide whether *Gadde* creates a heightened duty of care for a consumer of propane gas.

Plaintiff also argues that the Millers had the duty to investigate and make the land on which he entered safe. He cites Section 364 of the Restatement (Second) of Torts, which provides:

> A possessor of land is subject to liability to others outside of the land for physical harm caused by a structure or other artificial condition on the land, which the possessor realizes or should realize will involve an unreasonable risk of harm, if:
>
> (a) the possessor has created the condition, or
>
> (b) the condition is created by a third person with the possessor's consent or acquiescence while the land is in his possession, or
>
> (c) the condition is created by a third person without the possessor's consent or acquiescence, but reasonable care is not taken to make the conditions safe after the possessor knows or should know of it.

*See also Langen v. Rushton,* 138 Mich.App. 672, 360 N.W.2d 270 (1984) (shopping center owner may be liable for accident when tree planted near exit to street may have contributed to accident). Plaintiff argues that the dangerous reconfiguration of the gas supply line in 1981 was created with the Millers' consent or acquiescence while the land was in their possession. Millers insist that the reconfiguration was done without their knowledge but, as plaintiff points out, they knew that the change in propane supply had been made and had to know, from the lack of trenching across their property if from nothing else, that the line followed its original course.

Plaintiff also argues that the Millers are liable under the principles enunciated in *Berman v. LaRose,* 16 Mich.App. 55, 167 N.W.2d 471 (1969), which stated that a property owner could have liability for injuries on abutting land if the plaintiff could prove that the defendant (1) increased the hazards on the adjacent land, or (2) created new hazards on the adjacent land, or (3) had a servitude for his or her private benefit on the adjacent land, by a physical intrusion or otherwise, the enjoyment of which affected the area's safety and thus imposed a duty on defendant to maintain the area in a reasonably safe manner. *Id.* at 58–59, 167 N.W.2d at 473.

VanDenBerg asserts that the Millers had a duty to maintain their gas line because their line created or increased the hazard on the adjacent land and imposed a physical intrusion on the land. The Millers argue that the conclusion drawn by the court in *Otto v. City of St. Paul,* 460 N.W.2d 359 (Minn.Ct.App. 1990), should also be applied to them. The *Otto* case involved a claim against a property owner for injuries that occurred when a portion of a street collapsed due to undermining caused by leaks in a private sewer line. The court held that the property owners "bear the affirmative duty to exercise reasonable care in the maintenance of the private sewer line that serves their property." *Id.* at 361. After reciting the facts that the claimants presented at trial and argued would have put the property owners on notice that the sewer line was defective, which included several calls to a drain service to unclog their kitchen sink and a depression in the street in front of the home (which the court characterized as "indistinguishable from untold numbers of similar depressions in St. Paul streets"), the court found that the property owners had no knowledge that their sewer line was defective. *Id.* at 362. The court also concluded that the property owners had no duty to inspect their sewer line. *Id.* It cited the

rule that an "occupant's duty will be modified according to the expected use to which the land will be put." *Id.* (quoting *Peterson v. Balach,* 294 Minn. 161, 174, 199 N.W.2d 639, 647 (1972)). The court declined to find, under the circumstances described above, the duty to inspect a "sewer line resting 11 feet underground under the concrete or asphalt surface of a paved roadway" and held that "there is a common law duty to maintain and repair a private house drain only in circumstances in which a homeowner has actual knowledge of a defect." *Id.* The *Otto* case is not analogous to the instant case, however, because there is a fundamental difference between a sewer line and a gas line in terms of the inherent danger of a leak in a gas line.

■ Even if Millers are right that they owe no duty except the duty owed licensees as stated in Restatement (Second) of Torts, Section 342,[3] the record raises a question of fact as to whether the Millers "had reason to know" that there was a gas leak. The Restatement (Second) of Torts defines "reason to know" as follows:

> The words 'reason to know' are used throughout the Restatement of this Subject to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.

Plaintiff claims the problems the Millers had with markedly increased gas use after 1987 and incidents in which they ran out of gas put them on notice that there was a problem with their line that required investigation. The Millers argue that the "gas outs" were caused by a faulty gas meter, not by the leak, and that they were unaware of the increase in consumption. As the owners of the gas

---

**3.** Section 342 provides:
A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,
(a) the possessor *knows or has reason to know of the condition* and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and

(b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and
(c) the licensees do not know or have reason to know of the condition and the risk involved.
(Emphasis added in Millers' brief.)

line, the Millers had a duty to maintain it. The extent of their duty with respect to Mr. VanDenBerg remains to be decided but, whether he is considered a licensee or invitee, the issue of whether the Millers had information that put them on notice of a leak or created a duty to inspect cannot be decided on summary judgment.

## CONCLUSION

For the reasons stated above, Defendant H. Benjamin Loseth and Diane Loseth's Motion For Summary Disposition (docket no. 105) is GRANTED and Defendant Millers' Motion For Summary Judgment (docket no. 110) is DENIED.

